The STATE of Oklahoma ex rel.
Gil BURK et al., Plain-
tiffs-Appellants,

v.

OKLAHOMA CITY, a Municipal Cor-
poration, Defendant-Appellants,
and
The Two Thousand Classen Building Cor-
poration et al., Defendants-
Appellees.

No. 48052.

Supreme Court of Oklahoma.

July 27, 1976.

Rehearing Denied Nov. 30, 1976.

Thomas J. Lee and John Connolly, Oklahoma City, for plaintiffs-appellants.

Walter M. Powell and Mark E. Monfort, Oklahoma City, for defendant-appellants.

Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for defendants-appellees.

DOOLIN, Justice.

The Two Thousand Classen Building and the Oklahoma City street upon which it rests, have been the subject of litigation since June of 1968 when the president of the Two Thousand Classen Corporation conceived the idea of joining two office buildings together by vacation of the street separating them. Upon application the city council purportedly vacated the street and the Two Thousand Classen Building was constructed. Owners' allegations to the city council in support of vacation that the street had been occupied adversely for the previous five years were found to be fraudulent by this court in *State ex rel Burk v. Oklahoma City,* 522 P.2d 612 (Okl.1974) and the vacation was held to be null and void.[1]

We there stated that equity in seeking to redress fraud must try to restore the parties to their former position before the fraud was effected; but it does not insist on an absolute and literal restoration where it would be purposeless, useless and foolish, which in this case would require removal of the building and restoring tract as a public street. Appellees here, owners of the building, were given the option of removing the building or paying an annual lease to the City Council of Oklahoma City as trustees for Oklahoma City, for as long as the building encroaches on the street. The case was remanded to the trial court "to assess the value of the land in question and the annual rental value thereof."[2] The amount of rent set on remand was to remain effective for five years. At that time and every five years thereafter, the trustees might reassess the circumstances and adjust the rent accordingly. The lease payments from date of improper taking, until value is determined by trial court would bear interest rate at 10% per annum.

On remand three appraisers were appointed, one selected by appellant Oklahoma City, one by appellees and one by the court. Both sides submitted requested instructions to the appraisers. The instructions actually given to the appraisers required an opinion as to the fair market value of the land as of August 8, 1968, the date of improper taking, the fair annual rental value of the tract from August 8, 1968, to date of appraisal and the fair annual rental value of the tract for the period of five years from date of appraisal.

Fair market value was described in the instructions as:

"that amount of money which a purchaser willing but not obligated to buy the tract would pay to an owner willing but not obligated to sell it, taking into consideration all uses to which the land was adapted and might in reason be ap-

---

1. In original case plaintiffs were nearby property owners and defendants were council members and the City of Oklahoma City as well as appellees here, The Two Thousand Classen Building Corporation, American Fidelity Assurance Company and C. W. Cameron. On remand the court retained the original style of the case but on appeal the parties have realigned themselves, the City of Oklahoma City joining plaintiffs as appellants.

2. *State ex rel Burk v. Oklahoma City, supra* at 621.

plied. Since the tract is not being sold or acquired, the fair market value is to be determined as a step toward arriving at the fair rental value of the tract."

Fair rental value was described as:

"that amount of money which a lessee willing but not obligated to lease the tract would pay to lessor willing but not obligated to lease it, taking into consideration all uses to which the tract was adapted and might in reason be applied by a lessee."

Appellants objected to these instructions on the grounds they did not take into consideration the fact the decision in *Burk* was based on a finding the land was not taken by virtue of any negotiated sale or lease, but rather through fraud and without authority of law.

Appraisers report to the court showed they had used several techniques in arriving at the fair market value of the tract and the succeeding rental value. They stated approximately 20 to 30 land sales between 1967 to that date were considered by these appraisers. Major emphasis was put upon those sales of land with frontage along Classen Boulevard and other property in close proximity to the subject tract. After adjusting this sales data for differences between the sales and the subject tract, a reasonable range of value was indicated. In 1968, based upon a direct comparison in the market, the subject 21,000 square feet would have a range of value between $4.00 and $4.25 per square foot. In 1974, a value range between $4.50 and $4.75 per square foot was indicated. The demanded rate of return for land over this time period was then determined. In 1968, an 8% return was considered applicable. In 1974, a 10% rate of return was considered reflective of the market. Although appraisers also compared land rentals themselves and utilized a "land residual technique," the market data or direct comparison approach was given the greatest weight, and was considered the best approach in arriving at an estimate of the land value and rental applicable.

The final appraisal was not an average of the valuations submitted by each appraiser but rather a consensus among them by compromise. They submitted the following appraisal:

"From August 8, 1968 to September 16, 1974

| | |
|---|---|
| Land Value Estimate | |
| 21,000 square feet @ $4.25 | —$89,250 |
| Rate of Return Applicable to Land | — 8% |
| Annual Rental for this Five (5) Year Period | —$ 7,140 |
| Annual Net Rental (Rounded) | —$ 7,100 |
| From September 16, 1974 to September 15, 1979 | |
| (5 years) | |
| Land Value Estimate | |
| 21,000 square feet @ $4.75 | —$99,750 |
| Rate of Return Applicable to Land | — 10% |
| Annual Rental for this Five (5) Year Period | —$ 9,975 |
| Annual Net Rental (Rounded) | —$10,000" |

After submission of appraisers' report, City proposed a supplemental instruction requiring appraisers to consider in their valuation the increased market value of the two blocks also owned by appellees contiguous to and now joined together by the subject tract. The court refused the proposed additional instruction but stated that witnesses could be examined concerning this matter. Examination of the transcript indicates there was extensive testimony allowed as to the possible increased value of the consolidated tract.

The trial court considered both the report of the appraisers and the evidence and testimony offered at trial and arrived at the following evaluation of the tract:

"1. The value of the subject tract on August 6, 1968 was $105,000.00.

2. The annual rental value of the subject tract from August 8, 1968 to the date of this trial November 19, 1974, is the sum of $8,400.00 per annum;

3. The value of the subject tract on this date is $115,000.00;

4. The annual rental value of the subject tract for the term commencing November 19, 1974, and continuing through November 18, 1979, is $11,500.00 per annum."

Appellants appeal, claiming error of law in that trial court instructed the appraisers to base the value of the tract and its rental value on conventional fair cash market value which, they submit, is contrary to the sense of the opinion promulgated by this court in *Burk*. They further allege the trial court abused its discretion in fixing the value of the land at a figure of approximately $5.00 per square foot when there was evidence one piece of comparable property was sold for $10.83 per square foot.

Appellants contend the law of the case requires the trial court to consider appellees have been guilty of fraud. They feel that to consider the fair market value alone in setting the rental is to violate the intent of this Court to impose punishment on Cameron and his fellow defendants.

■ We do not agree. In *Burk*, although commenting on the reprehensible conduct of defendants, no directions were given to the trial court to award damages. To the contrary the decision rested on equitable restitutionary principles rather than on damages. The circumspect court decreed an equitable solution to a difficult situation and held "the best solution is an attempt to restore status quo." [3] Such a remedy is restitutionary, related though not identical to recission of a contract fraudulently obtained. A party who has been defrauded may rescind or may affirm and receive damages, but not both. *Viking Refrigerators v. McMeachin,* 145 Okl. 76, 291 P. 521 (1930); *Witt v. Garrod,* 187 Okl. 14, 101 P.2d 619 (1940); *Jennings v. Lee,* 105 Ariz. 167, 461 P.2d 161 (1969).

■ It is academic that once an appellate court decides law in a case on appeal that such law governs in all subsequent proceedings. *Berland's Inc. of Tulsa v. Northside Village Shopping Center Inc.,* 447 P.2d 768 (Okl.1968). The crux of this decision thus becomes whether trial court on remand complied with the directives propounded in *Burk*. In holding parties should be restored to status quo, this court invoked equitable, not punitive justice. The law of the case seems clear. The value of the land was to be assessed and the rent ascertained from this figure. There is no mention of damages, punitive or otherwise. The trial court did not err in setting the land value and its rental at a figure based on fair market value of the tract.

The further argument asserted by appellants is that rental value of the tract should have been based upon a square footage value of $10.83, the highest value placed on any lot in the area. Appellants admit this is an isolated case of a sale by a "holdout" seller.[4] In addition they offered evidence indicating Kansas City Life Insurance Company lent defendants $6.00 per square foot on the entire project. This although certainly evidence as to the value of the tract is not controlling in that such a loan is not necessarily based on the actual value of the land. The type of appraisal used in connection with that loan was not put into evidence.

The valuation of a strip of land, once a street is unique to this court and apparently to the court appointed appraisers. The appraisal was based primarily on a direct comparison with sales of similar properties reduced to a square footage value. The purchase of one lot for $10.83 per square foot, a price far above other similar prices can scarcely be an accurate measure of the fair market value of said tract.

■ We do not deny the results in *Burk* were predicated on fraud. But it was not an abuse of discretion by the trial court not to award an elevated and disproportionate value to the land when there was no indication by this court that it should extrapolate on the basis of such fraud. The appraisers competency, expertise and integrity are not questioned. The trial court heard all testimony and in its discretion arrived at a figure above that offered by the appraisers. Thus it was

---

3. *State ex rel. Burk v. Oklahoma City,* supra at 620.

4. An owner who does not want to sell.

not error to refuse to give the additional instruction to the appraisers regarding the increased value of the tract as a continuous building site.

We agree with appellees, the trial court has complied with this court's directions and has not abused its discretion in setting the valuation as it did.

AFFIRMED.

HODGES, V. C. J., and DAVISON, BERRY, LAVENDER and BARNES, JJ., concur.

IRWIN and SIMMS, JJ., dissent.

SIMMS, Justice (dissenting).

The majority holds that the trial court complied with our directions in *State ex rel. Burk v. Oklahoma City, Okl.,* 522 P.2d 612 (1974), by instructing the appraisers to determine the value of 20th Street according to conventional "fair market value" standards, and by fixing the value of 20th Street at half the square footage cost that appellees paid to acquire nearby land. I disagree and respectfully dissent.

This was not a conventional real estate transaction and conventional "fair market value" instructions were not applicable.

Appellees were not purchasers or lessees who were "willing, but not obligated" to buy or lease 20th Street. They were wrongdoers. They had attempted to vacate this public street through fraud. The vacation was void ab initio. "[Appellees'] private use of the public street was a trespass from its inception. The construction of a permanent structure thereon constituted a public nuisance per se and was unlawful each day it continued." *Burk, supra* at 619. Our decision in *Burk, supra,* gave appellees two options. They could remove the building and restore 20th Street as a public street; or, pursuant to our creation and imposition of a trust, they could make annual lease payments to the City Council of Oklahoma City as trustees for as long as the building encroaches on 20th Street.

The City of Oklahoma City was not an owner or lessor "willing but not obligated" to sell or lease 20th Street. The City Council held the property in trust for the public and was unable to "sell, barter or transfer it for a private use." *Burk, supra,* at 620. The Two Thousand Classen Building occupies a public street only by virtue of our decision in *Burk, supra.* It is only through that opinion that the City Council is required and authorized to accept lease payments as trustees for the public as compensation for the appellees' private taking of their street.

I agree with appellants that the instructions to the appraisers should have required them to consider the increased market value of the two blocks owned by appellees contiguous to and now joined together by the acquisition of the street. While the trial court did allow testimony regarding this matter, that testimony shows that in their determination of the tracts value, the appraisers did not consider this property's unique value to appellees and the special benefit its acquisition gave them.

The intent of the Court in *Burk, supra,* was to place the *rights* of the parties to the subject property in status quo, not to place the parties themselves in status quo. At page 620 we first discussed the availability of precedent for requiring appellees to remove their building from the City's street. We then considered quieting title to the building in the City.

We rejected these alternatives, stating that "equity will not insist on an absolute and literal restoration of the parties to status quo where it would be purposeless, useless and foolish." at 621. I understand this rejection of the destruction of the building and rejection of quieting title to the property in the City of Oklahoma City, to have resulted from a desire to prevent economic waste. We concluded this discussion of "restoration of status quo", at 621 with the following:

"[A]lthough the parties themselves cannot be restored to the situation existing

before, their *rights* in respect to the property which forms the subject matter in controversy shall be placed in status quo."

The Court then proceeded to place the "portion of the street which appellees fraudulently sought to vacate . . . in trust" and to establish provisions for paying an annual rental payment to the City Council of Oklahoma City as trustees for the public.

We rejected one extreme, the destruction of the building, and instead created possessory rights to the building in appellees contingent upon payment of annual rental to the City. I do not agree that we intended the other extreme—that appellees should pay less for the use and enjoyment of this property through this arrangement than they would have paid if the property had been available for acquisition through private negotiation and sale.

Testimony showed that seven comparable transactions resulted in a sale price in excess of $5.00 per square foot.[1] In one of these transactions, appellee Cameron paid $10.83 per square foot to acquire property for his complex. The majority dismisses this figure as an unrepresentative and "disproportionate" value since it was paid to a "hold-out" seller, and concludes that to place such a price tag on 20th Street would amount to an award of punitive damages against appellees.

I do not agree. Appellee Cameron willingly paid a private seller $10.83 per square foot to acquire property which the seller was willing to sell at that price. How can the assessment of at least that value to property which appellees sought to take through fraud and deceit, without benefit of law, be punitive in nature?

Appellees should pay the citizens of Oklahoma City for their property *at least* the amount per square foot that they paid to private individuals. The citizens of the City are the ultimate of "hold-out" sellers

for 20th Street is not subject to barter, sale or transfer. It is "leased" to appellees only through judicial direction and the citizens must rely on the courts to negotiate in their behalf.

In view of this evidence, I agree with appellants that the trial court abused its discretion in fixing the value of 20th Street at approximately $5.00 per square foot.

While *Burk, supra,* does not require the trial court to award punitive damages against appellees, it also certainly does not direct the trial court to make the appellees' attempted fraudulent vacation of a public street, and their unlawful construction of a building thereon, a commercially profitable venture.

I am authorized to state that Justice IRWIN joins me in this dissent.

---

1. Two sales at $5.33 per sq. ft., one sale at $5.67 per sq. ft., one sale at $7.14 per sq. ft., two sales at $5.71 per sq. ft., and one sale at $10.83 per sq. ft.